# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEFANIE J. FEINSTEIN | : |
| v. | : |
| | :    NO. |
| EMMA MERCADANTE, | : |
| SHERI MERCADANTE AND | : |
| GERALD MERCADANTE | : |

## COMPLAINT-CIVIL ACTION

And now, comes Plaintiff, by and through her undersigned attorney, by way of complaint against the Defendants, states the following:

## PARTIES

1. Plaintiff is an individual residing at 107 Wayne Court, West Chester, PA.

**2.** Defendant Emma Mercadante is an adult individual residing at 153 Park Avenue, Midland Park NJ 07432.

3. Defendant Sheri Mercadante is an adult individual residing at 300 Park Ave, Allendale NJ 07401.

4. Defendant Gerald Mercadante is an adult individual residing at 300 Park Ave, Allendale NJ 07401.

## JURISDICTION AND VENUE

5. Jurisdiction is based on diversity of citizenship as the Plaintiff is a resident of the Commonwealth of Pennsylvania and the Defendants are all residents of the State of New Jersey. The amount in controversy exceeds $75,000.00.

6. Venue is proper in this jurisdiction as many of the operative facts leading to liability took place in Eastern District of Pennsylvania and all of the harm inflicted on Plaintiff occurred within the district.

## FACTS COMMON TO ALL CAUSES OF ACTION

7. In 2002, Plaintiff graduated from Peirce Middle School, at which time she received the highest award given by the school, namely the American Legion Award.

8. After graduation, Plaintiff attended Henderson High School, where she was a standout student and a four-year star of the softball team.

9. Between 2003 and 2006, Plaintiff was a four-time First team all-conference player.

10. In 2006, Plaintiff was named second team All Southeastern Pennsylvania in softball.

11. In 2006, Plaintiff graduated from Henderson High School with honors.

12. Plaintiff then attended Hofstra University with a scholarship to play softball at the university.

13. Hofstra has a distinguished softball program at the Division I level, which made the NCAA tournament all four years in which Plaintiff attended and was a player on the team.

14. After graduating with honors from Hofstra University in 2010, Plaintiff was hired as the assistant softball coach at Bryant University where she also matriculated to obtain her Master's Degree.

15. During Plaintiff's tenure as assistant softball coach at Bryant University, the team showed significant improvement.

16. Plaintiff was the assistant softball coach at Johnson & Wales University for two years, during which time the team showed significant improvement.

17. Plaintiff also maintained a presence in the softball world by being the coach of travel teams and giving private lessons.

18. In 2021, Plaintiff was named the head coach of the Immaculata University softball team where she remained as coach until 2025.

19. In 2022 Plaintiff became involved in the RBI program associated with the Philadelphia Phillies.

20. The RBI program is designed to introduce baseball and softball to inner city youth.

21. In 2024 and again in 2025, Plaintiff was requested to be a coach of a softball team of players from around the country, playing in Europe.

22. During Plaintiff's tenure as head coach of the Immaculata Softball team, the team improved dramatically.

23. In 2025, the team came within one game of winning the conference championship, after which she was named Coach of the Year for the 2025 season.

24. As a result of Plaintiff's success on the softball field, Immaculata University offered Plaintiff a teaching position, for which she was to be paid.

25. Plaintiff accepted that position and began teaching at Immaculata University in September 2025.

26. Plaintiff is respected as a coach by players, other coaches and umpires.

27. During Plaintiff's eight years as a head or assistant coach at three different universities, there has never been a complaint lodged against her for inappropriate comments made on any topic.

28. As a person who has been in the softball world for over 30 years, Plaintiff has played with and against girls of different colors, creeds, nationalities, religions and sexual orientations.

29. Plaintiff considers herself to be an advocate for the marginalized individuals in her chosen sport.

30. On September 10, 2025, an individual named Charles Kirk was murdered while giving a presentation at a college in Utah.

31. Plaintiff learned of Kirk's death on September 10, 2025, at approximately 4:40 pm.

32. Plaintiff is not politically oriented and was not thoroughly familiar with Kirk or his agenda prior to his death.

33. That evening, Plaintiff researched Kirk and formed a negative opinion of him due to his positions related to women, minorities, and the LGBTQ community.

34. Kirk was the head of an organization named Turning Point USA.

35. Kirk, inter alia, went to different colleges and universities with the intent of convincing youthful Americans to join the Make America Great Again (MAGA) movement.

36. Kirk was a highly controversial individual who was known to make disparaging and hateful statements directed at the LGBTQ community, the black community, women, and those of the Jewish faith in the guise of Christian Nationalism and as part of the MAGA movement.

37. Kirk has said all of the following as it pertains to African Americans:

If I see a Black pilot, I'm going to be like, boy, I hope he's qualified. – The Charlie Kirk Show, 23 January 2024

If you're a WNBA, pot-smoking, Black lesbian, do you get treated better than a United States marine? – The Charlie Kirk Show, 8 December 2022

Happening all the time in urban America, prowling Blacks go around for fun to go target white people, that's a fact. It's happening more and more. – The Charlie Kirk Show, 19 May 2023

If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action? – The Charlie Kirk Show, 3 January 2024

If we would have said that Joy Reid and Michelle Obama and Sheila Jackson Lee and Ketanji Brown Jackson were affirmative action picks, we would have been called racists. Now they're coming out and they're saying it for us … You do not

have the brain processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously. – The Charlie Kirk Show, <u>13 July 2023</u>

38. In addition, Kirk took the following positions:

   a. Gun deaths are "unfortunately worth it" to preserve the Second Amendment.

   b. Called transgender identity a mental disease, needing "brain treatment."

   c. Refused to use people's correct pronouns: "I will not call a man a woman."

   d. Demanded a nationwide ban on gender-affirming care.

   e. Homosexuality is an "abomination" deserving death.

   f. Called Martin Luther King Jr. a "myth" and said the Civil Rights Act was a "huge mistake."

   g. Promoted the "Great Replacement" conspiracy theory that illegal immigrants were being taken in by the United States to replace Caucasians in the work force.

   h. Spread COVID-19 misinformation likening masks and vaccine mandates to "medical apartheid."

   i. Suggested mass incarceration as a fix for the housing crisis.

   j. Advocated for public, televised executions even for children to watch.

39. From these quotes and positions, it was obvious to Plaintiff that Kirk stood for a number of things that were diametrically opposed to what she had supported and causes for which she advocated for most of her life.

40. Subsequent to Kirk's murder, the Trump administration, and right-wing media, including social media influencers, began a campaign to elevate Kirk to martyrdom, deny his prior hateful comments and to declare "war" on anyone who did not treat Kirk and his murder with the deference that those entities believed he deserved.

41. These individuals and entities decided that it was within their purview to "cancel" anyone who "celebrated" Kirk's death by making them the targets of attack, including coordinated efforts to get his critics fired from their respective places of employment.

42. Soon the efforts were expanded to attack anyone who was even mildly critical of Kirk's conduct prior to his death and those who simply refused to see him as hero.

43. This created an environment of hate that not only allowed, but encouraged, Trump supporters and/or members of the MAGA movement to believe that it is patriotic and would further the MAGA movement to attack innocent individuals who expressed opinions that were contrary to the narrative that they were attempting to create about Kirk.

44. The intent of these attacks was to hurt liberals and/or any perceived opponents financially and emotionally.

45. The Defendants, individually, and collectively, acted in the manner as suggested by the right-wing terrorists and acted in a horrific manner toward Plaintiff because she held an opinion of Kirk that was contrary to the image being created by the Trump administration.

46. As this is the United States of America, and Plaintiff is an American citizen, she naturally believed that she was entitled to any opinion of Kirk she had formed and was free to express the same, as guaranteed to her by the First Amendment to the United States Constitution.

47. As there are no allegations, currently, of governmental involvement, Plaintiff is not asserting that the heinous acts described below are a depravation of any Constitutional right, but freedom of speech and thought *is* an overriding principle in this case.

48. Plaintiff understands that freedom of speech does not mean freedom from consequences, and in bringing this litigation, Plaintiff is seeking to hold Defendants responsible for the consequences of their actions.

49. Individuals must be held accountable under the law when they engage in speech and conduct that is intended to harm others simply because of a difference of opinion.

50. On September 10, 2025, at approximately 10:00 p.m., Plaintiff read a post on social media as seen below:

> Let me be clear, I'm not a White Christian Nationalist sympathizer or apologist. Don't tell me about your Christian love when Charlie Kirk is a voice you idolized. Charlie was a racist, homophobic, transphobic, misogynistic, xenophobic hateful bigot. There is no hate like Christian love. He was not a good person. No person is all good or all bad. But he continued to spew hate guised as Christian love. I'm not grieving the death of Charlie Kirk. I'm grieving the current state of America. I'm grieving the politics of white supremacy having a stranglehold on our nation. I'm grieving the ignorance of white Christian nationalists not understanding how their rhetoric causes harm to marginalized communities. I'll continue to condemn violence while simultaneously calling out hateful bigots. I will never be a safe space for Nazis. I don't wish death upon any person, even Charlie Kirk. This isn't a time for celebration. This is a time for grieving. Please understand the way you grieve this and the way I do will likely be completely different. I am grieving the ignorance of this nation. You are grieving the death of a Nazi.

51. This post expressed the opinion that Kirk's death was not to be celebrated.

52. Plaintiff shared that post on her *private* Instagram page.

53. The private setting means that the only people who can see her posts are those who follow her page.

54. On September 11, 2025, at approximately 7:45 a.m. Plaintiff read a direct message from Defendant Emma Mercadante, who had read Plaintiff's retweet of the post.

55. Defendant Emma Mercadante had previously played for the Immaculata softball team and was a 2025 graduate of the school.

56. Defendant Emma Mercadante was a player Plaintiff did not recruit but was recruited by the former coach at the school.

57. Defendant Emma Mercadante took great offense to the reposting and expressed her disdain for the post saying that it was evil rooted, that she found her faith through Kirk and Plaintiff should be more aware of what she was posting on social media.

58. Plaintiff responded to Defendant Emma Mercadante's message by stating that she understood her position and expressed happiness that Kirk helped her find her faith.

59. Plaintiff also stated that she had seen the video of the murder and understood that it was traumatizing.

60. Plaintiff further expressed her empathy for Kirk's family but that she had formed a negative opinion of him based on his statements about women, minorities and the LGBTQ community.

61. Plaintiff stated that while she grieved for Kirk's family, she would not grieve for Kirk.

62. Lastly, Plaintiff stated that she would remove the post out of respect for Defendant Emma Mercadente but hoped that she (Mercadante) understood that people were allowed to have different opinions of Kirk.

63. Plaintiff removed the post, and posted the following:

> CK was not a good person - that doesn't mean I don't believe he was a good father or husband, or that he deserved to die. No one deserves what happened to him yesterday. But that also doesn't mean I have to mourn the loss of a person who spoke outright against women's rights, against minorities, and was ok with some gun violence to protect the second amendment. I apologize to those who were offended by my previous share, so I have taken it down, but I will not mourn him for him. I will mourn for his wife and children, and all others who have lost their lives to gun violence.

64. All communications directed to Defendant Emma Mercadente were done through text messaging and/or social media communications.

65. Defendant Emma Mercadente read the messages but did not respond to them.

66. Thereafter, Defendants individually and collectively began a campaign to defame Plaintiff and either get her fired or force her to resign from her position as head softball coach at Immaculata University.

67. On September 11, 2025, at approximately 9:30 a.m., Plaintiff received a call from Paul Murphy, who is the athletic director at Immaculata University.

68. The purpose of Murphy's call was to remind Plaintiff not to discuss politics at softball practice.

69. As Plaintiff had **NEVER** discussed politics at any practice, she was naturally confused by this request.

70. Murphy then informed Plaintiff that the school had received a call informing it that Plaintiff was "boasting" about the death of Charlie Kirk, a categorically false and defamatory statement, as proven by the post itself.

71. Plaintiff then advised Murphy that she could not even have spoken about Kirk during practice as she did not learn of his death until after practice had ended the previous day.

72. She further advised Murphy that as the head coach, she had a policy not to allow political discussions at practice.

73. Murphy inquired as to whether Plaintiff had posted anything about Kirk on social media.

74. Plaintiff answered in the affirmative, advising that she was not "boasting" about his death and that it was posted on her private Instagram page, which had nothing to do with the school or her position as coach.

75. Murphy assured Plaintiff that there was "nothing to worry about".

76. On September 11, 2025, Murphy called Plaintiff again and expressed the concern that the story was getting bigger and that someone, unknown to Plaintiff at the time, had taken a screen capture of the post and sent it to several people on campus.

77. Murphy expressed concern that people were upset and wanted to advise Plaintiff of the situation in case it was brought up at that day's practice.

78. Out of an abundance of caution, Plaintiff cancelled that day's practice.

79. Later that same day, Plaintiff received another call from Murphy as well as a call from Patty Canterino, the Vice President of the school, assuring Plaintiff that she had not done anything wrong, had no need to apologize and expressed their support for her.

80. It was then that Plaintiff learned that it was Defendant Emma Mercadente who was sending the screen capture to people at the school and that it was her stepmother, Defendant Sheri Mercadante, who had called the school to complain.

81. Plaintiff had already agreed to, and had, in fact, taken down the post that put these actions into motion before the mass communications to the school had started.

82. On September 11, 2025, at approximately 10:00 p.m., Plaintiff received a text message from Defendant Gerald Mercadente, stating: "You should resign. Get ahead of this. It's (sic) going to get worse for you. We are tired of the woke DEI BS".

83. Plaintiff forwarded a screenshot of the text to Murphy and Canterino.

84. Plaintiff was advised that the school took Defendant Gerald Mercadante's text as a threat to Plaintiff's well-being and possibly her safety.

85. Plaintiff and Defendant Gerald Mercadante had some history wherein Mercadante had expressed displeasure over the fact that his daughter, Emma, had not been named to the All-Conference team.

86. There appeared to be personal animus from Defendant Gerald Mercadante toward Plaintiff as a result of what he perceived to be a snub toward his daughter, of which Plaintiff literally had no control.

87. Although Defendant Gerald Mercadante later apologized to Plaintiff and attempted to make amends, it is believed and therefore averred that Defendant Gerald Mercadante maintained

a grudge against Plaintiff that may have been part of the impetus for his actions related to the events averred herein.

88. As a result of Defendants' actions, individually and/or collectively, a petition was circulated demanding that Plaintiff resign because of alleged "hate" speech.

89. Plaintiff later learned that Defendant Sheri Mercadante was the person who created the petition.

90. Even a cursory review of the retweeted post indicates that there was no "hate" speech made by Plaintiff toward Kirk.

91. Plaintiff learned about the Petition on September 12, 2025.

92. The petition contained false and defamatory statements, including, but not limited to the statement that " numerous reports from students and faculty members have surfaced, detailing instances where Coach Feinstein has reportedly endorsed views that glorify violence."

93. No such reports exist as Plaintiff has never made any statements ever glorifying violence.

94. Defendant Gerald Mercadante is a coach with a local travel softball team.

95. On September 12, 2025, Plaintiff informed the Phillies of the incident because Defendant Gerald Mercadante's team was expected to attend a softball showcase at which Plaintiff was scheduled to work.

96. Plaintiff offered to skip the showcase to avoid any issues.

97. Later that day, Plaintiff was effectively fired by the Phillies out of concern for the safety of the players, created by the actions of Defendants.

98. It is to be noted that Defendant Emma Mercadante was not even on the team at this time as she had graduated from Immaculata University the previous spring.

99. As such, neither she nor any member of her family could be directly affected by Plaintiff remaining as the head coach of Immaculata softball.

100. Despite this, Defendants collectively were the persons behind the campaign to get Plaintiff fired.

101. Plaintiff again cancelled practice on September 12, 2025, opting instead to hold a team meeting in the presence of the VP.

102. The intent of the meeting was to deal with the situation directly so that Plaintiff, the school and the team could move past it.

103. Not a single player voiced any opposition to Plaintiff during the meeting, but reportedly a few expressed being upset afterward.

104. The consensus of the players was a desire to move forward, with Plaintiff remaining as the head softball coach.

105. On that date, at approximately 4:30 p.m., Plaintiff became aware of a threat made against her by another individual posted on Facebook.

106. It is believed and therefore averred that the person making the threat learned of the Plaintiff's shared as a result of the actions of the Defendants, individually and/or collectively.

107. Plaintiff was concerned about the post as it related to her own safety and that of her players.

108. After consulting with Immaculata's AD and VP, a decision was made to report the incident to the police.

109. The police informed Plaintiff that they would keep a patrol around Plaintiff to assure her safety while she was on campus.

110. Notwithstanding the measures taken by Plaintiff and the school, the petition was still circulating, and the number of signatures was growing.

111. On September 15, 2025, Plaintiff learned that the school had reportedly been inundated with complaints about her by telephone and email.

112. Plaintiff is aware of the studies that show the tendency of right-wing people to engage in political violence.

113. That, coupled with the threat posted on Facebook, convinced Plaintiff that her continued presence on Immaculata's campus created a danger to herself and others.

114. Plaintiff made the difficult decision to resign from her position as head coach out of respect for the school and concern over the safety of her players.

115. Plaintiff also resigned from her teaching position.

116. As set forth above, as a direct and proximate result of Defendants' conduct, Plaintiff lost her positions as head softball coach and teacher at Immaculate University as well as her position with the Philadelphia Phillies.

## COUNT I
## DEFAMATION
## (ALL DEFENDANTS)

117. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if more fully set forth herein.

118. The posts and petition referred to Plaintiff by name throughout, were made of and concerning Plaintiff, and were so understood by those who read the posts and petition.

119. The petition accuses Plaintiff of engaging in hate speech and calls for Immaculata to demand her resignation.

120. The accusation of engaging in hate speech relates directly and specifically to the meme Plaintiff reposted on her private Instagram page, which contains no hate speech, and condemns the murder of Kirk.

121. The entire petition is defamatory in that it asserts that Plaintiff had made multiple statements glorifying violence, all of which is false and intended to and did result in Plaintiff being held up to scorn, ridicule and hatred.

122. The petition is libelous on its face. It clearly exposed Plaintiff to, and did, in fact result in hatred, contempt, threats, ridicule and obloquy because it falsely accuses Plaintiff of making statements glorifying violence.

123. The petition was seen and read between September 12, 2025, and September 15, 2025, as evidenced by the indication that it had received 107 signatures.

124. Plaintiff was subsequently told that there were at least 350 signatures ultimately on the petition.

125. As a proximate result of the above-described publication, Plaintiff has suffered loss of her positions with Immaculata University and the Philadelphia Phillies, a loss of her reputation and dignity, and was subject to shame, mortification, and injury to her feelings all to her damage and loss, with financial damages to be established by proof at trial.

126. The above-described publication was not privileged because it was published by Defendants with malice, hatred and ill will toward Plaintiff and the desire to injure Plaintiff financially and emotionally.

127. Because of Defendants' malice in publishing, Plaintiff seeks punitive damages in addition to compensatory damages, a total amount to be established by proof at trial.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, in an amount of money in excess of $75,000.00, for compensatory damages, consequential damages, punitive damages; interest as allowed by law, costs of suit and such other and further relief as this court may deem just and proper.

### COUNT II
### TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP
### (ALL DEFENDANTS)

128. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if more fully set forth herein.

129. Plaintiff had a valid contract of employment with Immaculata University for her services as the head softball coach. A copy of the contract is attached hereto and marked as Exhibit "A".

130. Defendants had full knowledge of Plaintiff's contract with Immaculata University.

131. The purpose of their conduct was to have that contract terminated, in addition to the intent to harm Plaintiff generally.

132. Defendants intentionally attempted to induce Immaculata University to terminate Plaintiff's contract and fire her from her position as head softball coach.

133. Defendants had and have no lawful justification for their tortious interference with Plaintiff's employment contract with Immaculata University.

134. Plaintiff has suffered and will continue to suffer damages due to Defendants' tortious interference with her employment contract.

135. Plaintiff has suffered and will continue to suffer irreparable harm due to Defendants' tortious interference with her employment contract.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, in an amount of money in excess of $75,000.00, for compensatory damages, consequential damages, punitive damages; interest as allowed by law, costs of suit and such other and further relief as this court may deem just and proper.

## COUNT III
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

136. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if more fully set forth herein.

137. Defendants by act intended to inflict emotional distress upon Plaintiff via verbal and written threats, intimidation and harassment.

138. Said conduct was intentional and malicious and done for the sole purpose of causing Plaintiff to suffer humiliation, mental anguish and emotional and physical distress.

139. As a further proximate result of Defendants' actions and the consequences proximately caused by it, as hereinabove alleged, Plaintiff suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, in an amount of money in excess of $75,000.00, for compensatory damages, consequential damages, punitive damages; interest as allowed by law, costs of suit and such other and further relief as this court may deem just and proper.

## COUNT IV
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

140. Plaintiff incorporates by reference the averments contained in all previous paragraphs as if more fully set forth herein.

141. Defendants had a duty to Plaintiff in particular to act in a manner so as to not cause them emotional harm.

142. Despite the said duty, Defendants acted in such a manner so as to cause Plaintiff to suffer emotional harm, as more fully set forth above.

143. The Defendants' conduct was negligent.

144. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional harm as a result of which Plaintiff suffered a direct physical impact and a physical manifestation of the same.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, in an amount of money in excess of $75,000.00, for compensatory damages, consequential damages, punitive damages; interest as allowed by law, costs of suit and such other and further relief as this court may deem just and proper.

                ROVNER. ALLEN, ROVNER, and SIGMAN

      BY:_____
              STEVEN C. FEINSTEIN, ESQUIRE
            Attorney for Plaintiff